[No. C007628. Third Dist. Jan. 28, 1992.]

INGREDIENT COMMUNICATION COUNCIL, INC., Plaintiff, Cross-defendant and Appellant, v.
DANIEL E. LUNGREN, as Attorney General, etc., Defendant, Cross-complainant and Respondent.

COUNSEL

Orrick, Herrington & Sutcliffe, Norman C. Hile, Kenneth C. Mennemeier and Thomas A. O'Brien for Plaintiff, Cross-defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Craig C. Thompson, Clifford Rechtschaffen and Edward G. Weil, Deputy Attorneys General, for Defendant, Cross-complainant and Respondent.

OPINION

**PUGLIA, P. J.**—The Ingredient Communication Council, Inc. (ICC) is a nonprofit membership corporation doing business in California. Its membership consists of 37 manufacturers, retailers and agricultural producers involved in marketing thousands of products in retail stores in California which may be subject to regulation pursuant to Proposition 65, the Safe Drinking Water and Toxic Enforcement Act of 1986 (Act). (Health & Saf. Code, § 25249.5 et seq.) ICC was founded in 1987 to establish for the benefit of its members a consumer notification and warning program, using an 800 line telephone system in combination with newspaper advertising and in-store signs designed to promote consumer inquiries using the 800 line system. ICC designed this program to assist its members in complying with the warning requirements of the Act.

ICC brought an action for declaratory relief against the state Attorney General seeking an authoritative interpretation of a regulation issued by the state Health and Welfare Agency pursuant to the Act and a declaration that ICC's system for warning consumers about carcinogenic and toxic substances contained in its products in retail stores, using a combination of in-store signs, newspaper advertisements and a toll-free telephone number, satisfies the "clear and reasonable warning" requirement of the Act and the

regulation. The Attorney General cross-complained, seeking a declaration that the ICC system does not provide clear and reasonable warning.

The trial court interpreted the regulation at issue and declared the ICC system did not comply with the regulation as construed or the Act.[1] ICC appeals, contending the trial court (1) misinterpreted a portion of the regulation (Cal. Code Regs., tit. 22, § 12601, subd. (b)(1)(C)); (2) applied the wrong standard in determining the adequacy of ICC's warning system, and (3) provided an inadequate statement of decision. We shall affirm.

I

### The Regulatory Scheme

The Act provides that "[n]o person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving *clear and reasonable warning* to such individual . . . ." (Health & Saf. Code, § 25249.6, italics added; further statutory references to sections of an undesignated code are to the Health and Safety Code.)[2] Such warning "need not be provided separately to each exposed individual and may be provided by general methods such as labels on consumer products, . . . posting of notices, placing notices in public news media, and the like, *provided that the warning* accomplished *is clear and reasonable*." (§ 25249.11, subd. (f), italics added.) Violation of the Act may be enjoined and shall give rise to civil liability "not to exceed $2500 per day for each such violation . . . ." (§ 25249.7.) The Attorney General may bring an action to enforce the Act. (§ 25249.7, subd. (c).)

The Act requires the Governor to "designate a lead agency and such other agencies as may be required to implement [its provisions]. Each agency so

---

[1]The Attorney General also sought an injunction regarding use of the ICC warning system. However, after the trial court's tentative decision granting the injunction, the parties settled this portion of the cross-complaint and injunctive relief was not included in the final judgment.

[2]Section 25249.10 provides three bases for exemption from the section 25249.6 warning requirement: "(a) An exposure for which federal law governs warning in a manner that preempts state authority. [¶] (b) An exposure that takes place less than twelve months subsequent to the listing of the chemical in question on the list required to be published under subdivision (a) of Section 25249.8. [¶] (c) An exposure for which the person responsible can show that the exposure poses no significant risk assuming lifetime exposure at the level in question for substances known to the state to cause cancer, and that the exposure will have no observable effect assuming exposure at one thousand (1000) times the level in question for substances known to the state to cause reproductive toxicity, . . ."

At the time of trial, a regulation provided that food products that comply with "federal administrative standards" pose no significant risk of cancer. (Cal. Code Regs., tit. 22, § 12713, subd. (a).)

designated may adopt and modify regulations, standards, and permits as necessary to conform with and implement the provisions of [the Act] and to further its purposes." (§ 25249.12.)

On January 6, 1987, the Governor designated as lead agency the state Health and Welfare Agency (Agency). (Cal. Code Regs., tit. 22, § 12102, subd. (e).) On September 25, 1987, the Agency issued a draft regulation through which it sought to provide guidance regarding the adequacy of warning schemes—i.e., whether the message conveyed is "clear" and whether the method of conveyance is "reasonable." Included within this draft regulation were examples of messages and warning methods deemed by the Agency to be clear and reasonable. These "safe harbor" warning schemes, so called because their use constitutes compliance with the Act without the necessity of a case-by-case factual determination, included, for consumer products, labels on the products affixed by the manufacturer and identification of the products by the retailer through cash register receipts, shelf labels, signs, menus or a combination of these methods.[3]

On December 3, 1987, a public hearing was conducted concerning the draft regulation. The Grocery Manufacturers of America proposed adding another warning scheme to the regulation's safe harbor provisions to consist of "three major elements: (a) News media notices. [¶] (b) An in-store information sign. [¶] (c) A toll-free 800 telephone line."

The regulation eventually issued by the Agency, California Code of Regulations, title 22, section 12601 (hereafter title 22, section 12601), was substantially the same as the draft. However, to the safe harbor provisions in

---

[3]Application of these "safe harbor" provisions was explained by the Agency in a final statement of reasons (Gov. Code, § 11346.7, subd. (b)) setting forth the reasons for the language adopted by the agency in its regulations defining "clear and reasonable.":

"Normally, whether a warning is clear and reasonable will be a question of fact to be determined on a case by case basis. However, reasonable men can differ on what is clear, and what is reasonable. Even with the minimum requirements set forth in subsection (a) [of the draft regulation], a business may not be certain that its warning, as a matter of fact, will protect it from liability. Since the Act imposes civil liability where a warning is found not to be clear and reasonable, the Agency has concluded that it is necessary to provide businesses with an opportunity to be certain that the warning which they give is reasonable or clear, or both, and that providing general 'safe harbor' warning methods and messages which are deemed sufficient without further proof is a reasonable means to accomplish this result.

"As explained earlier, businesses are not required to give the 'safe harbor' warnings. Subsection (a) [of the draft regulation] specifically prevents the 'safe harbor' provisions of [the following] subsections (b), (c) and (d) from being construed as the only clear and reasonable warnings available. Businesses may provide whatever warnings they choose provided that they comply with the minimum requirements set forth in subsection (a). The 'safe harbor' is offered simply to provide the businesses choosing to use them reasonable certainty that they will not be subjected to an enforcement action over the warning they provide. It is not intended to be a warning straight-jacket."

title 22, section 12601, subdivision (b) was added a warning scheme similar to that proposed by the Grocery Manufacturers of America but qualified by the requirement that such scheme provide clear and reasonable warnings. (Tit. 22, § 12601, subd. (b)(1)(C).)

During the ensuing public comment period, the Attorney General, among others, indicated opposition to the additional warning scheme. The Agency nevertheless decided to retain that scheme in its final regulation. In its final statement of reasons (Gov. Code, § 11346.7, subd. (b)), the Agency explained that decision as follows: "The purpose of the Agency in adopting this provision is simply to acknowledge the possibility that a legally sufficient warning system could be developed. That is why the reference to such systems is qualified by the language '. . . that provides clear and reasonable warnings.' The Agency does not believe that such systems are clear and reasonable per se by virtue of their mere existence, and the Agency takes no position on the legal sufficiency of any particular system."

As issued in final form, subdivision (a) of title 22, section 12601 defines in general terms what is a clear and reasonable warning: "Whenever a clear and reasonable warning is required under section 25249.6 of the Health and Safety Code, the method employed to transmit the *warning must be reasonably calculated,* considering the alternative methods available under the circumstances, to make the warning message available to the individual prior to exposure. The *message must clearly communicate* that the chemical in question is known to the state to cause cancer, or birth defects or other reproductive harm. . . . " (Italics added.)

Subdivision (b) of title 22, section 12601 contains the safe harbor provisions. At the time of trial, it read in relevant part: "*Warnings* for consumer products exposures which include the methods of transmission and the warning messages *as specified by this subdivision shall be deemed to be clear and reasonable.* . . . [¶] (1) The warning may be provided by using one or more of the following methods singly or in combination: [¶] A. A warning that appears on a product's label or other labeling. . . . [¶] B. Identification of the product at the retail outlet in a manner which provides a warning. Identification may be through shelf labeling, signs, menus or a combination thereof. [¶] C. *A system of signs, public advertising identifying the system and toll-free telephone information services that provides clear and reasonable warnings.* . . ." (Italics added.)[4]

For the product labeling and shelf sign warning methods, the regulation specifies approved text for the warning itself. This text must be used in order

---

[4]Since trial, title 22, section 12601, subdivision (b)(1)(C) has been amended to read: "A system of signs, public advertising identifying the system and toll-free information services, *or any other system,* that provides clear and reasonable warnings." This change appears further to weaken the argument that toll-free information service based systems are entitled to safe

to assure safe harbor protection. (Tit. 22, § 12601, subd. (b)(4).)[5] The regulation does not contain approved text for any of the three elements of the toll-free information services based system described in title 22, section 12601, subdivision (b)(1)(C).

## II

### THE ICC WARNING SYSTEM

The first element of the ICC warning system is an 8½- by 11-inch sign that adheres to the glass on the entrance door of participating retail stores. The sign, sent to over 80,000 stores in California, states: "Proposition 65 requires that California consumers be warned about products containing chemicals known to the State to cause cancer or other reproductive harm or birth defects. To obtain this information on consumer products sold in California, please call 1-800-431-6565. A public service of the Ingredient Communication Council, Inc."

The second element of the ICC warning system is a newspaper advertisement campaign in which a "clip and save" quarter-page ad is run on a regular basis in 105 daily newspapers, including Spanish-language ones, throughout California. During the system's inaugural month, the ad was printed in the food section on the weekly "best food day"; thereafter the ad ran three times on a monthly basis, and since then once every other month. The advertisement begins with the words "BEFORE YOU BUY . . ." in large typeface. It then states Proposition 65 requires the consumer be given warnings about cancer, birth defects and other reproductive harm for particular brands of consumer products and provides a toll-free 800 number to call for information. No specific products or chemicals are listed.

---

harbor status. However, because we conclude the version of this provision operative at the time of trial does not provide a safe harbor, we need not further discuss the significance of this change.

[5] Title 22, section 12601, subdivision (b)(4) states in relevant part:

"The warning message must include the following language: (A) For consumer products that contain a chemical known to the state to cause cancer: 'WARNING: This product contains a chemical known to the State of California to cause cancer.' [¶] (B) For consumer products that contain a chemical known to the state to cause reproductive toxicity: 'WARNING: This product contains a chemical known to the State of California to cause birth defects or other reproductive harm.' [¶] (C) For food, other than alcoholic beverages, sold, served, or otherwise provided in food facilities, as defined in Health and Safety Code section 27521(a), which is intended for immediate consumption: 'WARNING: Chemical known to the State of California to cause cancer, or birth defects or other reproductive harm may be present in foods or beverages sold or served here.' [¶] (D) For fresh fruits, nuts and vegetables: 'WARNING: This product may contain a chemical known to the State of California to cause cancer, or birth defects or other reproductive harm.' . . ."

The third element of the ICC warning system is the toll-free 800 line itself. A caller dialing the 24-hour number is connected to a West Telemarketing facility located in Omaha, Nebraska. Trained operators ask callers which product they wish information about, verify the correct product spelling, and activate a computer to generate the appropriate taped message. At the conclusion of the taped message, the caller is requested to stay on the line for further information or information regarding other products. The operator can then refer the caller to a manufacturer's phone number for additional information or repeat the process for additional products. It takes approximately one minute for a caller to inquire and audit the message for each product.

Using an ICC form, the product manufacturer can choose the text of the computer-generated messages to be read to consumers. The messages for those products requiring a warning include the precise language in the regulation setting forth the approved safe harbor text for printed labels and shelf signs. (Tit. 22, § 12601, subd. (b)(4).) The manufacturer can also supplement this warning with other information about the product.

Between 7,000 and 8,000 products were registered in the ICC warning system. However, in the first year of operation, only about 400 products carried required warning messages. Although the system was designed to handle up to a million calls per year, only about 26,000 calls reached the toll-free number in the first year of operation. In response to these calls, only 488 warning messages were played.

At trial, various expert witnesses offered favorable opinions about the ICC warning system. The designer of the system, James O'Reilly of Procter & Gamble, described some of the consumer advantages of the 800 line system compared to product labeling or shelf signs: (1) The telephone operators are trained to respond to inquiries in both Spanish and English and the computer can generate taped messages in Spanish; (2) the warnings can be updated very quickly as the Agency makes regulatory changes regarding certain products; and (3) the warnings can cover remote catalog purchases of products.

Ronald Olsen of the Sacramento Bee testified the newspaper advertisements promoting the 800 line provide a good method of informing consumers about the ICC warning system. The primary grocery shopper for each household is likely before shopping to see the quarter-page ad located near other food advertisements in the weekly food section. The newspaper medium plus the "clip and save" format provide a greater degree of permanence

than would advertisements in electronic media. Olsen opined that printing the names of over 400 specific products bearing warnings would intimidate and discourage people from reading the newspaper ad.

John Goodman, president of a consumer research company, testified the ICC toll-free number is more effective than most 800 services in disseminating information to callers. The telephone trunk lines are adequate at West Telemarketing to avoid frequent blockages and busy signals that might discourage callers and the operators are adept at referring callers seeking additional information to other numbers.

Terrence Broderick, a distribution manager for Gerber Baby Foods, testified to the large potential cost increase his company would face if it had to place warning labels on all its varieties of food. Similarly, Wilber Shinner, marketing director for Safeway, and Charles Collings, president of Raley's, testified to projected additional retail costs of providing and maintaining nonadhesive supermarket shelf signs bearing required warnings for products. Both Shinner and Collings emphasized the need frequently to inspect the shelf signs lest retailer liability result from the propensity of playful children, or even "bounty hunters," to knock down or move them.[6]

Lee Shull, a toxicologist, testified the ICC warning system is superior to product labeling and shelf signs from the consumer standpoint because it provides more thorough information; after playing the taped message, the telephone operators can refer the caller to a manufacturer number where additional information about the precise risk factors of a product can be obtained. William Viscusi, an economics professor, also extolled the superiority of the ICC warning system on the grounds it avoids overwarning and the dilution of impact phenomenon caused by standardized label warnings on too many products.

On the other side, Michael Mazis, a marketing professor, testified for the Attorney General that the ICC warning system was ineffective. Mazis emphasized the undisputed fact that the 800 line issued only 488 product warning messages in its first year of operation. Mazis also opined the posted in-store signs bearing the 800 number were inconspicuous because they lacked a headline and shoppers were unlikely to cut out the infrequent newspaper ads because they offered no product-specific information.

---

[6]Collings testified that "the law provides that a person can collect a bounty if they [*sic*] bring an action against someone for failure to provide notification, that they can collect a portion of that award as a bounty." Collings suggested such tactics were being used by "the very people who wrote Proposition 65."

Harold Kassarijian, a management professor, testified most shoppers make unplanned or impulse purchases of grocery products and assume the products are safe unless specifically informed otherwise. Thus, the ICC warning system is ineffective because most shoppers are unlikely to read newspaper advertisements or call a phone number before purchasing the product. Kassarijian also inferred ineffectiveness from the fact the ICC warning system only issued 488 warnings in a state with 10-15 million households.

Finally, James Hammitt, an economic analyst with the Rand Corporation, disputed ICC's cost estimates for the alternative product labeling and shelf sign warning methods. Hammitt concluded the average cost increase for manufacturers and retailers would not exceed 1 percent and 0.3 percent for labeling and shelf signs respectively. Most of these increased costs easily could be passed along to consumers.

The trial court, issued a 16-page tentative decision explaining its reasons for declaring the ICC warning system invalid for failure to give clear and reasonable warning. ICC thereafter requested a statement of decision, seeking findings and conclusions on 23 additional issues. The trial court responded by issuing the tentative decision as its statement of decision. ICC objected to this statement of decision as incorrect and inadequate. The court nevertheless entered judgment declaring title 22, section 12601, subdivision (b)(1)(C) did not constitute 800 number based warning systems a safe harbor per se and the ICC warning system did not give clear and reasonable warning as required by the Act and the regulation.

## III

ICC contends the trial court misinterpreted the safe harbor provisions of title 22, section 12601, subdivision (b)(1) to exclude toll-free information services based warning systems. Title 22, section 12601, subdivision (b), declares: "Warnings for consumer product exposures which include *the methods of transmission and the warning messages as specified by* this subdivision *shall be deemed to be clear and reasonable.*" (Italics added.) Immediately following the acknowledged safe harbor methods specified in that subdivision for product labeling (tit. 22, § 12601, subd. (b)(1)(A)) and shelf signs (tit. 22, § 12601, subd. (b)(1)(B)) is "[a] system of signs, public advertising identifying the system and toll-free information services *that provides clear and reasonable warnings.*" (Italics added; tit. 22, § 12601, subd. (b)(1)(C).)

Although ICC contends this latter method, also specified in title 22, section 12601, subdivision (b), is also a safe harbor, ICC concedes it is not a pure safe harbor method under the regulation. Of the methods listed, only the ICC-type system must *independently* meet the test of providing "clear and reasonable warnings." (Tit. 22, § 12601, subd. (b)(1).) The toll-free information services based system is also a comparatively more complicated, interlocking three-part network lacking any approved regulatory text—at least concerning "signs" and "public advertising."

ICC suggests the only way for a court to reconcile the addition of a toll-free information services based system within the safe harbor provisions of the regulation with the independent requirement that such system provide clear and reasonable warnings is to determine whether the system is employed in a reasonable manner, i.e., whether it is a "quality" toll-free number system judged against other toll-free number systems.

█ "[T]he ultimate interpretation of a statute or administrative regulation is a question of law, and we are not bound by the trial court's determination." (*Jones* v. *California Interscholastic Federation* (1988) 197 Cal.App.3d 751, 756 [243 Cal.Rptr. 271].)

█ The initial question before us is whether the language of title 22, section 12601, subdivision (b)(1)(C) requires a court assaying the clearness and reasonableness of a warning issued by means of "a system of signs, public advertising identifying the system and toll-free information services" to apply a standard different from that applied to a similar review of nonsafe harbor warning methods. We think not. In effect, that part of the regulation together with the first paragraph of subdivision (b) states a tautology: a toll-free information services based warning system shall be deemed clear and reasonable provided it is clear and reasonable.

In the face of this ambiguity, we may resort to the extrinsic aid of the Agency's final statement of reasons. The Agency articulated its purpose in enacting subdivision (b)(1)(C) of section 12601 as "simply to acknowledge the possibility that a legally sufficient warning system could be developed. . . . The Agency does not believe that such systems are clear and reasonable per se by virtue of their mere existence . . . ." If a system is not clear and reasonable per se, it is not a safe harbor warning method. In effect, the Agency gave with one hand but took away with the other.

Nevertheless, ICC refuses to submit to such logic, arguing that even the pure safe harbor methods are not actually clear and reasonable *per se* because those methods must still be applied in a reasonable manner, as

determined on a case-by-case basis. Labels and shelf signs bearing the prescribed text may still be inadequate if presented unreasonably. (Tit. 22, § 12601, subd. (b)(3).)[7] Thus, ICC suggests the bright line supposedly distinguishing a safe harbor method from a nonsafe harbor method is exaggerated by the Attorney General.

ICC makes too much of the threshold requirement that safe harbor labels and shelf signs bearing the approved text must be easily noticeable. Such determination is a very narrow one for a reviewing tribunal, necessitating the submission of little evidence beyond the label or sign itself. By contrast, the determination of whether a three-part warning system allowing considerable discretion as to the details clearly and reasonably conveys the requisite information to consumers necessarily entails the production and analysis of considerably more evidence.

ICC's suggestion that the trial court merely determine whether ICC's toll-free information service comprises "quality" components is a vague, abstract standard irrelevant to the statutorily compelled inquiry whether the warning system gives consumers clear and reasonable warning before being exposed to chemicals known to cause cancer or reproductive toxicity. Store signs, public advertising and an 800 number might all be individually "good" in comparison with similar components used for other purposes, yet together they may not succeed in giving clear and reasonable warning to consumers.

Moreover, there is no basis to support ICC's suggestion there is some intermediate standard between a pure safe harbor warning, deemed per se clear and reasonable, and a nonsafe harbor warning, which must be evaluated on a case-by-case basis. The most that can be said for the Agency's placement of the regulatory language pertaining to toll-free information services amidst that describing the acknowledged safe harbor methods of warning is that it is mischievous and misadvised.

■ We acknowledge the long-established canon of statutory and regulatory construction: "Interpretive constructions which render some words surplusage, defy common sense, or lead to mischief or absurdity, are to be avoided." (*California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d

---

[7]Title 22, section 12601, subdivision (b)(3) states: "The warnings provided pursuant to paragraphs (1)(A) and (1)(B) shall be prominently placed upon a product's label or other labeling or displayed at the retail outlet with such conspicuousness, as compared with other words, statements, designs, or devices in the label, labeling or display as to render it likely to be read and understood by an ordinary individual under customary conditions of purchase or use."

836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].) ■■■ The ICC system must be evaluated on its specific facts just as any other nonsafe harbor method of warning. The system as a whole is adequate only if it gives clear and reasonable warnings.

## IV

■■■ ICC contends that even if its warning system is correctly deemed a nonsafe harbor method, in determining its adequacy the trial court applied the incorrect standard of review. ICC argues that under the regulations, a court determining the adequacy of a warning method need only decide whether the user has attempted to make the warning message *available* to consumers. The trial court need not ascertain the effectiveness of that warning message in operation.

Title 22, section 12601, subdivision (a) states in relevant part: "Whenever a clear and reasonable warning is required under Section 25249.6 of the Health and Safety Code, the method employed to transmit the warning must be *reasonably calculated,* considering the alternative methods available under the circumstances, to make the warning message *available* to the individual prior to exposure." (Italics added.) The trial court ruled that "where a system has been in effect for a sufficient period of time to allow for modification and alteration, implicit in the notion of 'reasonable calculation' [in tit. 22, § 12601, subd. (a)] is that the system is actually effective in operation."

Again, we review de novo the trial court's interpretation of subdivision (a) of title 22, section 12601. (*Jones* v. *California Interscholastic Federation, supra,* 197 Cal.App.3d at p. 756.) We focus first on the meaning of the requirement the method be "reasonably calculated" to make the warning "available." ICC suggests the requirement contemplates consideration only of the circumstances existing at the time the warning system was created. We reject such a narrow interpretation. A reasonable calculation about availability made before a warning system is underway may prove unreasonable in light of operational experience with the system, necessitating adjustments to achieve the required availability in light of the new facts. Endorsing an incorrect judgment frozen in time would be inconsistent with the Act's requirement that clear and reasonable warning be given. (Health & Saf. Code, § 25249.6.)

ICC also contends the trial court's requirement that the warning message be *conveyed effectively* is inconsistent with the regulation's language that the

message merely be made *available* prior to exposure. ICC is incorrect. Viewed in context, the terms are consistent. The trial court's "effective conveyance" requirement relates to whether consumers are likely to see or hear specific warning language prior to purchase or use of a product, not whether consumers fully understand and appreciate the warning and then modify their behavior accordingly. Any meaningful definition of "availability" prior to exposure must similarly consider the probability of the prospective consumer seeing or hearing the warning message. Availability of the warning message, to be consistent with the Act, must mean more than the possibility a consumer would be apprised of the specific warning message only through considerable effort.[8] An invitation to inquire about possible warnings on products is not equivalent to providing the consumer a warning about a specific product.

Finally, the trial court was aware, despite ICC's contrary assertion, that under title 22, section 12601, subdivision (a), some comparison with alternative methods of warning is required in assessing the reasonableness of a warning system's design. The trial court must consider the efficacy, cost, and other characteristics of alternative warning methods in assessing the reasonableness of a particular method. While the trial court correctly acknowledged a user need not employ what might in the abstract be deemed the "best" method, the court also rejected the possibility such user might refuse to employ features which could significantly improve the efficacy of the warning *without significantly increasing costs.*

V

██  Having determined the trial court's interpretation of title 22, section 12601, subdivision (a) was correct, we next examine whether the trial court erred in concluding the ICC system fails to provide a clear and reasonable warning where required by Proposition 65. Specifically, we ask whether substantial evidence supports the trial court's finding that the ICC warning system is not reasonably calculated, considering the alternative methods available in the circumstances, to make the warning message available to the

---

[8]ICC suggests the Agency may have chosen the lower theoretical level of availability because of the "low threshold risk involved when Proposition 65 warnings are triggered . . . ." We are unpersuaded by this speculation. The threshold risk under Proposition 65 is not especially low compared to other epidemiological standards commonly used by regulatory bodies. Some agencies of the federal government, for example, restrict carcinogens if they cause one additional case of cancer per million people exposed over a lifetime. Under Proposition 65, warnings are required if one additional case of cancer per 100,000 people can be expected. (Cal. Code Regs., tit. 22, § 12703, subd. (b).)

individual prior to exposure. (*Clark Equipment Co.* v. *Wheat* (1979) 92 Cal.App.3d 503, 518 [154 Cal.Rptr. 874].)

The record contains ample evidence supporting the trial court's finding. The critical evidence set forth at trial was the undisputed fact that in its first year of operation the ICC system provided a total of only 488 taped telephone warning messages to California consumers. This evidence alone was sufficient to support an inference by the trial court the ICC system failed to make warnings available to consumers in any meaningful sense. Moreover, there was expert testimony that so few warnings in a state with 10-15 million households indicated the ICC system was a complete failure.

The witnesses Mazis and Kassarijian identified flaws in both the conception and execution of the ICC system which explained its negligible level of use. The major conceptual problem was that the system proceeded on the assumption most consumers before shopping sit down with the food section of the newspaper each week, see the advertised 800 number, make a list of the specific brand names of products they intend to buy, and then call to check whether these products carry a warning. This assumption is contradicted by the fact that about two-thirds of the buying decisions made by grocery consumers are made in the store on impulse. In addition, few consumers are willing to spend time researching and calling about those relatively inexpensive products they frequently buy in a grocery store; such purchases differ from those of automobiles or computers.

The ICC warning system is also flawed by the sparseness and inconspicuousness of its in-store signs and infrequent newspaper advertisements, neither of which mention specific products requiring warnings. The 800 number itself would likely discourage all but the most meticulous and inquisitive shoppers because the taped message for each separate product runs about a minute and approximately 95 percent of the products carry no warning. The small number of warnings given through the toll-free line does not reflect a lack of consumer interest in the healthfulness of products; rather, in the absence of a specific warning, most consumers assume the products they buy are safe. Mazis concluded even the "worst working label" would convey the required warnings to more consumers than the ICC system.

We acknowledge ICC set forth testimony that the small number of calls indicates instead a lack of public concern about Proposition 65 warnings because the Act has such a low risk threshold. We also acknowledge undisputed evidence that adopting safe harbor warning methods would

increase costs for manufacturers and retailers. Only the size and significance of such cost increases is disputed. In addition, ICC set forth the shortcomings of product labels and shelf signs, both of which are often overlooked amidst the clutter of information. Such evidence, however, does not diminish the sufficiency of the evidence supporting the trial court's finding that the ICC system, considering the available alternatives, failed clearly and reasonably to make required warnings available to individual consumers prior to exposure.

## VI

ICC contends the trial court committed reversible error by failing to make specific findings in its statement of decision regarding a number of issues ICC requested the court to address. Indeed, ICC requests that, because of undisputed evidence in the record, we make the appropriate findings and direct entry of judgment in favor of ICC. (Code Civ. Proc., § 909.) We decline.

After the trial court issued its tentative decision, ICC requested a statement of decision addressing 23 "controverted issues not mentioned in the Tentative Decision." For example, ICC requested the court determine specifically the relative effectiveness of various available warning methods, such as product labeling and shelf signs, including an analysis of the cost, danger of overwarning and user liability risk for each method. In addition, ICC sought detailed determinations on the quality of each element of the ICC warning system and whether ICC members could establish reasonableness merely by acting in good faith. In response, the trial court ordered that the tentative decision be deemed the statement of decision. The trial court did not err.

Code of Civil Procedure section 632 provides: "In superior, municipal, and justice courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial. The request must be made within 10 days after the court announces a tentative decision unless the trial is concluded within one calendar day or in less than eight hours over more than one day in which event the request must be made prior to the submission of the matter for decision. The request for a statement of decision shall specify those controverted issues as to which the party is requesting a statement of

decision. After a party has requested such a statement, any party may make proposals as to the content of the statement of decision. [¶] The statement of decision shall be in writing, unless the parties appearing at trial agree otherwise; however, when the trial is concluded within one calendar day or in less than 8 hours over more than one day, the statement of decision may be made orally on the record in the presence of the parties."

"A trial court in rendering a statement of decision under Code of Civil Procedure section 632 is required only to state ultimate facts rather than evidentiary facts." (*People* v. *Casa Blanca Convalescent Home, Inc.* (1984) 159 Cal.App.3d 509, 524 [206 Cal.Rptr. 164, 53 A.L.R.4th 661].) None of the issues for which ICC sought determination was material to the ultimate fact that the ICC system did not provide clear and reasonable warning. The standard applied by the trial court—whether the ICC system was reasonably calculated, considering the alternative methods available under the circumstances, to make the warning message available to the individual prior to exposure—does not require the trial court to perform a detailed cost-benefit analysis of all the possible alternative warning methods. Such analysis would yield only evidentiary facts. The court need only indicate in its statement of decision that it did consider the ICC system within some context of possible alternatives.

ICC is apparently disturbed that the statement of decision did not mention the shortcomings of product labels and shelf signs—the safe harbor warning methods—despite the considerable testimony offered at trial. Nevertheless, the trial court did indicate the ICC system failed to use other available nonsafe harbor enhancements to its telephone information service: "[A]n effective 800 number system requires, as a first step, a more complete in-store notification system which provides product-specific warnings." Even ICC witness Shinner admitted it would not be a problem to post more of the 800 toll-free number signs in the stores. The trial court merely made the reasonable inference that more numerous signs could more easily be linked to particular products, perhaps through symbols, in some manner short of full-blown safe harbor shelf signs.[9]

The trial court did not fail to address any material issue of ultimate fact.

---

[9]ICC notes the Agency rejected in-store compendia and symbols as safe harbor warning methods. However, the issue here is not whether such methods would create a safe harbor warning scheme but whether such methods, in combination with the toll-free 800 number, would provide clear and reasonable warning to consumers.

The judgment is affirmed.

Sparks, J., and Marler, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 23, 1992. Panelli, J., and Baxter, J., were of the opinion that the petition should be granted.