[No. A109252. First Dist., Div. Three. Nov. 17, 2005.]

ENVIRONMENTAL LAW FOUNDATION, Plaintiff and Appellant, v.
WYKLE RESEARCH, INC., Defendant and Respondent.

C<span style="font-variant:small-caps">OUNSEL</span>

James R. Wheaton, Iryna A. Kwasny and Joshua Joseph Borger for Plaintiff and Appellant.

McKenna Long & Aldridge, Ann G. Grimaldi, Eric S. C. Lindstrom and Stanley W. Landfair for Defendant and Respondent.

O<span style="font-variant:small-caps">PINION</span>

**POLLAK, J.**—The Environmental Law Foundation (ELF) appeals from a summary judgment dismissing its complaint under the California Safe Drinking Water and Toxic Enforcement Act of 1986, Health and Safety Code section 25249.5 et seq. (Proposition 65 or the Act), against Wykle Research, Inc. (Wykle). ELF contends the trial court erred in holding that the warning of

mercury toxicity Wykle includes with the dental amalgam it manufactures comes within the "safe harbor" provisions of the regulations issued under Proposition 65, conclusively establishing that the warning is "clear and reasonable" as required by Health and Safety Code section 25249.6. Whatever shortcomings there may be in the present regulatory scheme to ensure that dental patients are advised of the possible risks arising from the presence of mercury in the amalgam, we conclude that the trial court correctly determined that Wykle has satisfied its obligations under the current statutory and regulatory scheme.

## Background

Wykle is a Nevada corporation, with no manufacturing facilities in California, which manufactures and distributes to California dentists filling material, or amalgam, used to restore teeth after the removal of tooth decay. The amalgam contains mercury, about which there is a long-standing dispute as to whether its presence creates a risk to the health and safety of a patient in whose mouth the filling material is placed. The history and contours of "the dental amalgam controversy" are well summarized in *Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 457–461 [110 Cal.Rptr.2d 627]. Whether or not patients are in fact exposed to potentially significant levels of mercury or mercury vapors during the filling process or from subsequent leakage of mercury into the oral cavity, the State of California has classified mercury and mercury compounds, pursuant to Health and Safety Code section 25249.8 , as chemicals known to the state to cause reproductive toxicity. (Cal. Code Regs., tit. 22, § 12000, subd. (c).) This designation invokes the mandate of Proposition 65 that "No person in the course of doing business shall knowingly and intentionally expose any individual" to the chemical "without first giving clear and reasonable warning to such individual." (Health & Saf. Code, § 25249.6.)

ELF's complaint against Wykle, like those it brought against other manufacturers and distributors of dental amalgam, almost all of which have been resolved by settlement, alleges that Wykle has failed to provide clear and reasonable warnings, violating Health and Safety Code section 25249.6 and constituting an unlawful business practice within the meaning of Business and Professions Code section 17200. The complaint alleges that Wykle's "mercury products expose both the dental patients treated with these products and the dental office workers using such products to toxic mercury and mercury vapor, presenting a known risk of birth defects and other adverse reproductive effects. "

Wykle has included with all amalgam shipped into California since 1993 a warning intended to comply with Proposition 65. The warning was originally placed on the outside of each box of capsules, and was later included on an

insert placed inside each package. Over time the insert has gone through a series of revisions. Since September 1998 the warning has been included on a two-columned insert entitled "Instructions for Self-activating Capsules," a copy of which is attached as an appendix to this opinion. The left column contains a section captioned "Instructions," followed by "Helpful Hints." The major portion of the right column is the "Material Data Safety Sheet" (MSDS) for the product, as required by the hazard communications standard established pursuant to the federal Occupational Safety and Health Act (see 29 U.S.C. § 655; 29 C.F.R. § 1910.1200(g) (2005).) This portion of the insert, which is identified as the MSDS in particularly small type that hardly sets it apart from the balance of the insert, consists of nine numbered sections, the heading for each of which is emphasized by placing it between horizontal lines across the length of the column. The nine sections are entitled, respectively, "Product Identification," "Hazardous Ingredients," "Physical Data," "Fire and Explosion Data," "Health Hazard Data," "Reactivity Data Stability," "Spill and Disposal Procedures," "Safe Handling and Use Information," and "Special Precautions." At the top of the right column, immediately prior to the MSDS, is a paragraph headed "ADA Specifications," which reads as follows: "ADA SPECIFICATIONS: Wykle Research, Inc. amalgam is guaranteed to comply with ANS/ADA Specification No. 1 for Alloy of Dental Amalgam. Mercury complies with the requirements of ISO 1560—Dental Mercury. PRECAUTIONS: In accordance with the ADA specifications, we issue the following warning for the types of amalgam which contains zinc: This alloy contains zinc and the amalgam made therefrom may show excessive corrosion and expansion if moisture is introduced during the mixing and condensing. In compliance with the California Safe Drinking Water and Toxic Enforcement Act of 1986, the following warning is issued: *WARNING: This product contains a chemical known to the State of California to cause birth defects or other reproductive harm.*" (Italics added.) The italicized warning is the portion that Wykle contends satisfies the requirements of Proposition 65.

All of the text on the insert is in relatively small print, but the Proposition 65 warning is in no smaller type than used throughout the insert. The Proposition 65 message begins with the capitalized word "WARNING," which is in the same size font as the words "ADA SPECIFICATIONS" and "PRECAUTIONS" that precede the information relating to the specifications of the American Dental Association (ADA). The entire insert appears on one side of a single page.

In August 2002, the trial court granted Wykle's motion for summary judgment, "on the grounds that pursuant to Proposition 65, Wykle did in fact provide clear and reasonable Proposition 65 warnings to dentists because all of its dental amalgam sold in California for all relevant periods of time contained package inserts that contained the Proposition 65 'safe harbor'

warning language. *See* 22 Cal. Code Regs, § 12601."[1] The trial court's order went on to observe that "by operation of the doctrine of informed consent, dentists who implant dental amalgam in their patient's teeth must provide their patients with all information material to their treatment, including Proposition 65 warnings" so that the package inserts provide "a clear and reasonable warning to the patient as a matter of law."

ELF moved for reconsideration of this order based on the contention that a recent amendment to the regulations[2] precluded reliance on the informed consent doctrine to uphold the sufficiency of warnings given to the dentists rather than to their patients. The trial court granted reconsideration but reaffirmed its original holding, observing that the adequacy of the informed consent doctrine to ensure that the warning reached the patient was but "an ancillary issue" to whether the warning came within the safe harbor provisions of the regulations. Thereafter, judgment was entered and ELF timely filed notice of appeal.

## Discussion

Proposition 65 "provides that '[n]o person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving *clear and reasonable warning* to such individual . . . .' (Health & Saf. Code, § 25249.6, italics added . . . .) Such warning 'need not be provided separately to each exposed individual and may be provided by general methods such as labels on consumer products, . . . posting of notices, placing notices in public news media, and the like, *provided that the warning* accomplished *is clear and reasonable.*' ([Health & Saf. Code,] § 25249.11, subd. (f), italics added.)" (*Ingredient Communication Council, Inc. v. Lungren* (1992) 2 Cal.App.4th 1480, 1484 [4 Cal.Rptr.2d 216], fn. omitted.) Section 25249.12 of the Health and Safety Code authorizes the lead agency designated by the Governor to "adopt and modify regulations, standards, and permits as necessary to conform with and implement the provisions of this chapter and to further its purposes." Pursuant to this authority, implementing regulations have been promulgated by what is now the Office of Environmental Health Hazard Assessment (OEHHA). Section 12601 of these regulations addresses the subject of "clear and reasonable warnings."

Section 12601, subdivision (a) provides in general terms as follows: "Whenever a clear and reasonable warning is required under Section 25249.6

---

[1] All references to section 12601 are to California Code of Regulations, title 22, section 12601.

[2] The recent amendment to the regulations is the addition of subdivision (b)(2)(B) of section 12601.

of the Act, the method employed to transmit the warning must be reasonably calculated, considering the alternative methods available under the circumstances, to make the warning message available to the individual prior to exposure. The message must clearly communicate that the chemical in question is known to the state to cause cancer, or birth defects or other reproductive harm. . . ." Subdivision (b) of section 12601 goes on to provide the so-called safe harbor provisions for consumer products exposures:[3] "Warnings for consumer products exposures which include the methods of transmission and the warning messages as specified by this subsection shall be deemed to be clear and reasonable." The methods of transmission that qualify for safe harbor recognition are specified in subdivision (b)(1): "The warning may be provided by using one or more of the following methods singly or in combination: [¶] (A) A warning that appears on a product's label or other labeling. The term 'label' means a display of written, printed or graphic matter upon a product or its immediate container. The term 'labeling' means any label or other written, printed or graphic matter affixed to or accompanying a product or its container or wrapper. [¶] (B) Identification of the product at the retail outlet in a manner which provides a warning. Identification may be through shelf labeling, signs, menus, or a combination thereof. . . ."[4] Subdivision (b)(3) of section 12601 specifies that "[t]he warnings provided pursuant to subparagraphs (1)(A) and (1)(B) shall be prominently placed upon a product's label or other labeling or displayed at the retail outlet with such conspicuousness, as compared with other words, statements, designs, or devices in the label, labeling or display as to render it likely to be read and understood by an ordinary individual under customary conditions of purchase or use." Finally, subdivision (b)(4) of section 12601 specifies the language that the warning message must contain in order to qualify for recognition as a safe harbor. There is no dispute that Wykle's

---

[3] Section 12601 distinguishes between consumer products exposures (*id.*, subd. (b)), occupational exposures (*id.*, subd. (c)) and environmental exposures (*id.*, subd. (d)). (See also Cal. Code Regs, tit. 22, § 12102, subd. (i).) Although ELF's complaint might be understood to allege that Wykle fails to give the necessary warning for both consumer products exposures and occupational exposures, in seeking summary judgment Wykle pointed out that the federal Occupational Safety and Health Administration has ruled that the occupational exposure warning provisions of Proposition 65 cannot be enforced against out-of-state manufacturers of workplace products. (62 Fed.Reg. 31159, 31166, 31180 (June 6, 1997).) ELF did not take issue with this proposition but contended in the trial court that the exposure of California dental workers to mercury vapor from Wykle's dental amalgam constitutes a form of "environmental exposure," which includes all exposures that are not consumer products exposures or occupational exposures. (§ 12601, subd. (d).) On appeal, however, ELF argues only that Wykle fails to give the warnings required for consumer products exposures.

[4] Section 12601, subdivision (b)(1)(C) includes "[a] system of signs, public advertising identifying the system and toll-free information services, or any other system, that provides clear and reasonable warnings." (See *Ingredient Communication Council, Inc. v. Lungren, supra,* 2 Cal.App.4th at p. 1485.) Subdivision (b)(1)(D) provides considerably more detailed requirements for alcoholic beverages.

inserts use the precise terminology specified for products containing chemicals known to cause reproductive toxicity.[5]

ELF's challenge to the sufficiency of Wykle's warning is essentially twofold. The principal thrust of its argument is that Wykle has not chosen to utilize the safe harbor method of providing notice that is best suited to reach the patients who will be exposed to its product. "Wykle can seek to avail itself of the 'safe harbor' regulations describing methods of warnings," it argues, "but it cannot choose the one least calculated actually to achieve the goal: warn the exposed individual. While Wykle's chosen method falls far short of being the 'clear and reasonable warning' the statute requires, Wykle easily could have taken advantage of another of the regulation's 'safe harbor' provisions by giving dentists a sign to place in their office with a Proposition 65 warning."

 This argument misperceives the effect of the safe harbor provisions. If a warning message in the words specified in the regulation is given in one of the methods specified by the regulation, the warning "shall be deemed to be clear and reasonable." (§ 12601, subd. (b).)[6] The warning may be provided "by using one or more" of the methods specified. (§ 12601, subd. (b)(1).) These "safe harbor" warning schemes are "so called because their use constitutes compliance with the Act without the necessity of a case-by-case factual determination." (*Ingredient Communication Council, Inc. v. Lungren, supra,* 2 Cal.App.4th at p. 1485.) If a party subject to the requirements of Proposition 65 provides a warning in one of the specified safe harbor methods, it need not determine the efficacy of the chosen method or whether some other method would be more effective. "Since the Act imposes civil liability where a warning is found not to be clear and reasonable," the revised final statement of reasons for adopting section 12601 recites, "the Agency has concluded that it is necessary to provide businesses with an opportunity to be certain that the warning which they give is reasonable or clear, or both . . . .

---

[5] Section 12601, subdivision (b)(4) reads in part: "The warning message must include the following language: [¶] . . . [¶] (B) For consumer products that contain a chemical known to the state to cause reproductive toxicity: [¶] 'WARNING: This product contains a chemical known to the State of California to cause birth defects or other reproductive harm.' "

[6] As used in the regulations, the method of transmission relates to the reasonableness of the warning, whereas the content of the message relates to its clarity. According to the Revised Final Statement of Reasons for the regulations, "There are two elements to any warning: the manner in which the warning is presented, and the message by which the warning is communicated. The term 'reasonable' appears to have been intended to apply to the first element. The manner of transmission must be reasonable. The term 'clear', on the other hand, appears to have been intended to refer to the message which the warning must convey. Therefore, in order for a warning to be clear and reasonable, the manner of transmission must be reasonable, and the message employed must be sufficiently clear to communicate the warning." (OEHHA, Rev. Final Statement of Reasons (Oct. 8, 1988) p. 2; see also OEHHA, Final Statement of Reasons (July 2002) p. 2.)

[¶] . . . The 'safe harbor' is offered simply to provide the businesses choosing to use them reasonable certainty that they will not be subjected to an enforcement action over the warning they provide." (OEHHA, Rev. Final Statement of Reasons (Oct. 6, 1988) pp. 7–8; see 22 Cal. Code Regs., Div. 2, § 12601, Clear and Reasonable Warnings.) Section 12601 was not intended "to establish a hierarchy of required warnings, just 'safe harbors.' Further, a hierarchy would imply that the warning method used under the Act be more than reasonable; that it must be the best method. This is not the case. Warnings must simply be clear and reasonable." (OEHHA, Rev. Final Statement of Reasons, *supra*, at p. 11.) "[A] manufacturer does not have to use the best warning method to comply with Proposition 65." (*People ex rel. Lungren v. Cotter & Co.* (1997) 53 Cal.App.4th 1373, 1394 [62 Cal.Rptr.2d 368].) Hence, whether or not posting signs in dental offices would be a more dependable means of warning patients than including inserts in the packages that may be read only by the dentists or their assistants, Wykle has fulfilled its obligations if the insert that accompanies its product comes within any of the safe harbor provisions.

 In this light, the disagreement between the parties over the ability to rely on dentists to warn their patients of the risks of mercury exposure is, as the trial court correctly observed, "an ancillary issue." There are two potential sources of an obligation of a dentist installing mercury-containing amalgam in a patient's mouth to warn the patient of any risk of reproductive toxicity. The first is Proposition 65 itself. Health and Safety Code section 25249.6 places the duty to give a clear and reasonable warning upon any person who in the course of doing business knowingly and intentionally exposes another person to a chemical determined by the state to cause cancer or reproductive toxicity. Every dentist is a "person" within the meaning of the statute (Health & Saf. Code, § 25249.11, subd. (a)), but a "person in the course of doing business" does not include one who employs fewer than 10 employees in his or her business (*id.*, subd. (b)). Many dentists therefore may not be subject to the mandate of the statute. Nonetheless, the professional duty of the dentist to obtain the patient's informed consent before performing dental procedures may require the dentist to make such disclosure to the patient. (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 241–245 [104 Cal.Rptr. 505, 502 P.2d 1]; *Warren v. Schecter* (1997) 57 Cal.App.4th 1189, 1200 [67 Cal.Rptr.2d 573].) In the case of prescription drugs, the regulations expressly recognize "the prescriber's accepted practice of obtaining a patient's informed consent" as sufficient to ensure that drug labeling provided under federal law is deemed clear and reasonable. (§ 12601, subd. (b)(2)(A).) And the newly adopted provision upon which ELF's motion for reconsideration was based similarly acknowledges "the accepted practice of obtaining the patient's informed consent" as ensuring that a warning is clear and reasonable in the case of exposures resulting from emergency or urgent medical or dental care in

defined circumstances. (§ 12601, subd. (b)(2)(B).)[7] Yet, as ELF argues and OEHHA's response to comments to the proposed amendment acknowledged, there may well be situations in which Proposition 65 warnings "might not otherwise be provided or required under other regulatory schemes or principles" such as the tort doctrine of informed consent. (OEHHA, Final Statement of Reasons, *supra*, p. 6.) Since those dentists with fewer than 10 employees are not subject to the mandate that they transmit Proposition 65 warnings to their patients, ELF undoubtedly is correct that it may not be assumed that Wykle's transmission of warnings to dentists ensures that the warning will be conveyed to all dental patients. What this proves, however, is only that for warnings included with medical and dental supplies sold to medical providers, one of the safe harbor methods of transmission may be insufficient to guaranty that the warnings reach the consumer/patient. This may suggest a need for revisions to the statute or to the present regulations—a matter not within the province of the court, and as to which we express no opinion—but it does not support the conclusion that a manufacturer who complies with the current safe harbor provisions is not protected from liability if alternative methods of transmission would be more effective.

ELF's second ground of attack, expressed in various ways throughout its brief, is that the warning on Wykle's insert is not sufficiently conspicuous to provide assurance that it will be read by those who receive it. ELF acknowledges that the warning language is taken verbatim from the safe harbor regulation (§ 12601, subd. (b)(4)(B)),[8] but contends that its size and placement on the instructions for "Self-Activating Capsules" fails to satisfy section 12601, subdivision (b)(3). As set forth above, this paragraph specifies that

---

[7] ELF argues that because the addition to the regulation was limited to emergency care, rather than to the provision of all medical devices as originally proposed, the new provision reflects a determination by OEHHA that a medical provider's duty to obtain informed consent may not be relied upon to ensure that a notice is clear and reasonable and reaches the patient in other than the specified emergency situations. However, OEHHA explained that it restricted the amendment to such situations because "there are over 4,000 separate categories of medical devices, as reported by the petition, and . . . there was no supportable basis for adopting special provisions . . . for all medical device exposures." (OEHHA, Final Statement of Reasons, *supra*, p. 7.) OEHHA said nothing to indicate that application of any of the safe harbor methods of transmission to providers of medical devices or other medical or dental supplies was dependant on a showing that physicians or dentists would, because of the doctrine of informed consent or otherwise, in fact relay the warnings to their patients.

[8] While acknowledging that Wykle's warning "tracks the language of the regulation," ELF refers disparagingly to the "single sentence stating that an unnamed substance in the product may cause birth defects or reproductive harm." ELF asserts that this message is not sufficient to apprise the dentist, as a learned intermediary, of the specific risks that should be communicated to the patient. "This cryptic sentence does not give enough information to exercise the independent judgment that underlies the doctrine of informed consent and its related doctrine of the learned intermediary." Nothing in section 12601 prohibits warnings more expansive than those specified in the regulation (see *id.*, subd. (a)). But whatever the shortcomings may be of the abbreviated message, the regulation states explicitly that it "shall

"[t]he warnings provided pursuant to subparagraph[] (1)(A) . . . shall be prominently placed upon a product's . . . labeling . . . with such conspicuousness, as compared with other words, statements, designs, or devices in the . . . labeling . . . as to render it likely to be read and understood by an ordinary individual under customary conditions of purchase or use." Subdivision (b)(3) of section 12601 thus effectively blurs the bright line otherwise provided by the safe harbor provisions. As urged by one party in a different context, "even the pure safe harbor methods are not actually clear and reasonable *per se* because those methods must still be applied in a reasonable manner, as determined on a case-by-case basis. Labels and shelf signs bearing the prescribed text may still be inadequate if presented unreasonably." (*Ingredient Communication Council, Inc. v. Lungren, supra,* 2 Cal.App.4th at pp. 1491–1492.) In response to this assertion, the court in *Ingredient Communication Council, Inc.,* observed that the party was "mak[ing] too much of the threshold requirement that safe harbor labels and shelf signs bearing the approved text must be easily noticeable. Such determination is a very narrow one for a reviewing tribunal, necessitating the submission of little evidence beyond the label or sign itself." (*Id.* at p. 1492.)

ELF argues that Wykle's insert does not satisfy section 12601, subdivision (b)(3) because "Wykle [has] placed a fine print warning under an improper heading ('ADA Specifications') on a sheet containing over ten other headings with similar fine print warnings" which the reader of the package insert is not likely to see. There is some force to this criticism. Although the MSDS portion of the insert contains a conspicuously designated section entitled "Health Hazard Data," that is not where the warning appears. Rather, the warning is appended to the less conspicuously captioned paragraph containing information required by the American Dental Association,[9] following a precaution relating to the use of zinc, another ingredient of the amalgam. As the paragraph is organized, the reader might well understand the Proposition 65 warning to refer to the zinc rather than to the mercury included in the amalgam.[10]

---

be deemed to be clear and reasonable" (*id.,* subd. (b)). Any dissatisfaction with the adequacy of such a warning is a matter for consideration by OEHHA and the Legislature, rather than the court.

[9] The requirements currently appear in American National Standard/American Dental Association Specification No. 1, Alloy for Dental Amalgam, approved by the American National Standards Institute on January 9, 2003, effective January 9, 2004.

[10] The fact that the warning language does not specifically indicate that it is referring to a risk created by the mercury, however, is not in itself a deficiency under the regulations to Proposition 65. As explained in the Revised Final Statement of Reasons concerning the adoption of section 12601, "The regulation does not require specific chemical references. Further, such a construction would be contrary to the Agency's intention in adopting this regulation. It was intended that, at a minimum, warning messages would advise of the presence of a listed chemical, regardless which one. If the exposed individual desires information about the chemical, it appears preferable that the information be obtained from the party responsible

Wykle's insert is a composite of (a) information and suggestions concerning the method of working with the amalgam in creating a dental filling, (b) ADA-required information, (c) the Proposition 65 warning, and (d) the MSDS. Except for combining the ADA and Proposition 65 warnings into a single paragraph, the insert separates these categories of information. There is no requirement that these categories be integrated to the extent they convey related information, but there is also no reason why they cannot be. The federal regulation prescribing the content of an MSDS for hazardous chemicals provides that the MSDS must state, among other things, "[t]he health hazards of the hazardous chemical, including signs and symptoms of exposure, and any medical conditions which are generally recognized as being aggravated by exposure to the chemical." (29 C.F.R. § 1910.1200(g)(2)(iv) (2005).) The "Guidelines for Employer Compliance," which appear as an appendix to the federal regulation, explain that "[t]here is no specified format for the MSDS," but the "non-mandatory format" provided in OSHA Form 174 suggests including "medical conditions generally aggravated by exposure" in a section captioned "Health Hazard Data." (29 C.F.R. § 1910.1200, Appendix E, par. 4(B) (2005); OMB No. 1218-0072.) A reader attempting to ascertain health risks presented by exposure to the amalgam would certainly seem more likely to note the Proposition 65 warning if it were included in the MSDS portion of the insert under the conspicuous heading "Health Hazard Data" than if appended to the paragraph concerning ADA specifications.

Nonetheless, for the purpose of determining compliance with Proposition 65, the question is whether, in comparison with the rest of the insert, the required warning is sufficiently conspicuous that it is likely to be read by an ordinary reader. In opposing Wykle's summary judgment motion, ELF submitted the declaration of a retired professor with expertise in "information processing, marketing research, consumer behavior, consumer perception, and public opinion studies." The professor opined, "Generally, package warnings inserts are not read carefully enough for dentists and dental workers to notice the warning message inconspicuously placed and virtually hidden in the large block of fine print," and that in his opinion Wykle's insert "would not provide sufficient notice of the warning message to the dentists and dental workers before they are exposed to mercury in the product." There is merit, however, to Wykle's objection that the expert's opinion as to the sufficiency of the warning is a question of law for the court (see *Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178–1182 [82 Cal.Rptr.2d 162]), and that the professor's declaration provides no foundation for his opinion as to the care with which dentists and their assistants read the instructions that accompany the products with which they work on a professional basis (see *Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 563–564 [115 Cal.App.4th 621,

for the exposure after the warning, rather than through the warning. Otherwise the warnings may become visually too congested and cumbersome to read and understand."

10 Cal.Rptr.3d 34]; *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 [8 Cal.Rptr.3d 363] ["an expert's opinion based on assumptions of fact without evidentiary support [citations] or on speculative or conjectural factors [citation] has no evidentiary value [citation] and may be excluded from evidence"]). To the contrary, it is critical that the "ordinary individual" who customarily uses the amalgam within the contemplation of section 12601, subdivision (b)(3) is a dentist or trained dental assistant bearing responsibility for care of the patient and proper use of the amalgam. Given the professional obligations of those to whom the information on the insert is directed (see, e.g., *Cobbs v. Grant, supra,* 8 Cal.3d at pp. 241–245; *Brown v. Superior Court* (1988) 44 Cal.3d 1049, 1061–1062 [245 Cal.Rptr. 412, 751 P.2d 470]; *Carmichael v. Reitz* (1971) 17 Cal.App.3d 958, 989–991 [95 Cal.Rptr. 381]; cf. *Magee v. Wyeth Laboratories, Inc.* (1963) 214 Cal.App.2d 340, 345–354 [29 Cal.Rptr. 322]), there is no basis to assume that such a person is not likely to read and understand the warning. While we do not believe that the Proposition 65 warning is ideally placed, the paragraph relating to ADA specifications in which it is included also refers to matters about which one working with the amalgam is presumably interested and thus is not likely to overlook. While small, the print used throughout the insert is not so tiny as to be illegible to a person attempting to read it. To conclude that the warning included in Wykle's single-page insert gives rise to a factual question as to whether the insert complies with section 12601, subdivision (b)(3) would, in our view, be at odds with the underlying objectives of the safe harbor provisions. The trial court therefore correctly granted Wykle's motion for summary judgment.

### Disposition

The judgment is affirmed.

McGuiness, P. J., and Corrigan, J., concurred.

# Appendix[*]

*Reporter's Note: The original single-page warning is reproduced on this page in a reduced size to accommodate pagination constraints; pages 73 to 76 repeat the warning in the font size of the original, but as a single column due to pagination constraints

# ORIGINAL D™
### Dispersion System
## phasealloy™
#### DISPERSION PHASE ALLOY

# INSTRUCTIONS FOR SELF-ACTIVATING CAPSULES®

Manufactured by Wykle Research, Inc.
2222 Hot Springs Road Carson City, NV 89706
**(800) 859-6641 (702) 887-7500**

## INSTRUCTIONS:

When using Self Activating Capsules® (SAC®), the alloy/mercury ratio is preset for optimum handling characteristics.

1) SAC® capsules require no activation. Place the capsule into the amalgamator arms. Be sure that it is properly seated.

2) Triturate for the recommended number of seconds (refer to Table) NOTE: Amalgamator speeds vary. Slow speed amalgamators should NOT be utilized.

3) After proper trituration, open the capsule by twisting the top slightly and pulling. At this point you may remove the pestle and mull for 1-2 seconds if desired. This will clean the capsule and place the amalgam into a single plastic ball-like mass. Tap the capsule slightly to remove the amalgam. 4) Proceed with condensation and placement.

## HELPFUL HINTS:

1) *Trituration:* Proper trituration is one of the most important factors in bringing out the physical and clinical properties. Amalgam should be a cohesive plastic mass that feels very warm. Over trituration may result in a dry mix that feels hot, is less cohesive with faster setting time. Under trituration may result in a dry or crumbly mix which may be wetter and slower setting. If necessary, adjust trituration time until you get a proper set.

2) Condensation and placement of alloy: For a Class 2 restoration, place the appropriate matrix band(s) and wedge the gingival interproximal areas. This will seal the gingival margin(s) of the cavity preparation and gain slight separation of the interproximal space to aid in proximal contact placement. (We recommend the Wykle Wedge, available in 11mm, 13mm, 15mm, and 17mm sizes). For all classes of cavity preparation, condense the alloy until the preparation is slightly overfilled.

3) Begin carving the alloy prior to the initial set. It is at this time that the occlusal morphology and marginal ridges can be most easily sculpted. Upon completion of carving, the interproximal wedges are taken out and the matrix band is carefully removed in an oblique direction (Occlusolingually or occlusobuccally) using a curved hemostat. Burnishing of the restoration can be done at this time, or as we recommend, use a fine grit prophy paste on a nylon bristle brush to "prepolish" and coalesce carved surfaces together and remove surface scratches produced from carving instruments. Optimal polishing of the alloy restoration can be performed after a 24-hour period.

| Amalgamators | Speed Setting | Speed Hz | 1Spill | 2Spill | 3Spill |
|---|---|---|---|---|---|
| Adec | High | (60Hz) | 7-8 | 9-11 | 11-13 |
| Baker-Hampton | High | (75Hz) | 4-5 | 6-7 | 7-8 |
| Caulk Vari-Mix II (Old pre-1980) | H-1 | (78Hz) | 7-9 | 9-11 | 11-13 |
| Caulk Vari-Mix II | H-1 | (67Hz) | 8-10 | 9-12 | 12-14 |
| Caulk Vari-Mix III | H | (62Hz) | 10-13 | 12-14 | 13-15 |
| Kerr Auto-Mix | 4200 | (70Hz) | 6-8 | 8-10 | 8-11 |
| Pelton Crane | High | (58Hz) | 14-16 | 18-22 | 20-24 |
| Pelton Crane Spirit | 4500 | (75Hz) | 6-8 | 8-10 | 8-11 |
| Silamat | High | (72Hz) | 7-9 | 9-10 | 10-11 |
| Silamat Plus | High | (72Hz) | 7-9 | 9-10 | 10-11 |
| Toothmaster (Old) | Low | (56Hz) | 20-25 | 25-35 | N/A |
| Toothmaster (Mod 300 - Setting SIL) | High | (67Hz) | 9-11 | 11-13 | 12-15 |
| Wig-L-Bug (Reg) | Low | (52Hz) | 20-25 | 25-30 | 30-35 |
| Wig-L-Bug (DS80) | High | (60Hz) | 12-14 | 15-17 | 18-20 |
| Wig-L-Bug (LP60) | High | (75Hz) | 10-13 | 13-16 | 15-18 |
| Wig-L-Bug (S2000) | High | (70Hz) | 8-10 | 9-12 | 11-13 |

This table is a guide. Allow variations for office current, amalgamator age and condition. For 220 Volt/50 cycle machines, increase time by 15%, or 1-4 seconds. *Not recommended for Torit or Capmaster amalgamators.

115

ADA SPECIFICATIONS ...de Research, Inc. amalgam is guaranteed to comply with ANS/ADA Specification No. 1 for Alloy for Dental Amalgam. Mercury complies with the requirements of ISO 1560 - Dental Mercury. PRECAUTIONS: In accordance with ADA specifications, we issue the following warning for the types of amalgam which contain zinc: This alloy contains zinc and the amalgam made therefrom may show excessive corrosion and expansion if moisture is introduced during the mixing and condensing. In compliance with the California Safe Drinking Water and Toxic Enforcement Act of 1986, the following warning is issued: WARNING: This product contains a chemical known to the State of California to cause birth defects or other reproductive harm. ~~BUD - CoBUZAT /~~

Material Safety Data Sheet Revision Date: 02-22-96 Product# MS-CAPS

## Section I - Product Identification

| | |
|---|---|
| Wylde Research, Inc. | Self Activating Capsule Original D and Phasealloy Product Code: 61140, 61142, 61150, |
| 2222 Hot Springs Road | 61152, 61240, 61242, 61250, 61252, 61340, 61342, 61350, 61352, 91130, 91132, |
| Carson City, NV 89706 | 91140, 91142, 91150, 91152, 91230, 91232, 91240, 91242, 91250, 91252, 91330, |
| (702) 887-7500 | 91332, 91340, 91342, 91350, 91352 |

## SECTION II - HAZARDOUS INGREDIENTS

| Ingredients | CAS Number | OSHA-PEL | ACGIH-TLV | DOT NUMBER |
|---|---|---|---|---|
| MERCURY | 7439-97-6 | 0.1 mg/m$^3$ | 0.05 mg/m$^3$ | UN2809 |
| SILVER | 7440-22-4 | 0.01 mg/m$^3$ | 0.01 mg/m$^3$ | |
| TIN | 7440-31-5 | 0.1 mg/m3 | 0.1 mg/m$^3$ | |
| COPPER | 7440-50-89 | 1.0 mg/m$^3$ | 1.0 mg/m$^3$ | |
| ZINC | 7440-66-6 | N/A | N/A | |

## SECTION III - PHYSICAL DATA

BOILING POINT: 675° F/357° C (Mercury) N/A (Alloy)
VAPOR PRESSURE: 0.0012mm HG° 20 C (Mercury) N/A (Alloy)
VAPOR DENSITY: (Air=1) : 7.0 (Mercury); N/A (Alloy)
SOLUBILITY IN WATER: Insoluble
SPECIFIC GRAVITY: 13.6 (Mercury); 8.0 (Alloy)
MELTING POINT: 38.89° C (Mercury); 1,000° C (Alloy)
APPEARANCE AND ODOR: A sealed, semi-rigid plastic container of heavy mobile liquid metal, (Mercury), with a free flowing, metallic gray powder (Alloy), odorless.

## SECTION IV - FIRE AND EXPLOSION DATA

FLASH POINT: N/A
EXTINGUISHING MEDIA: Use extinguishing agent suitable for surrounding fire.
SPECIAL FIRE FIGHTING PROCEDURES: For large fires, use water spray, fog or alcohol foam. Move product from area, if possible. Cool product exposed to flames with water from side until well after fire is out. Use agent suitable for surrounding fire. Wear a self contained breathing apparatus (SCUBA) w/full face piece operated under demand or positive pressure.
UNUSUAL FIRE AND EXPLOSION HAZARDS: Use water in flooding amounts as a fog. When exposed to high temperatures that occur during a fire, mercury can vaporize to form extremely toxic fumes. Keep upwind. Alloy is flammable when exposed to flames.

## SECTION V - HEALTH HAZARD DATA

CARCINOGENICITY: Questionable
ACUTE HEALTH EFFECTS: Inhalation of high concentration of mercury vapor can cause almost immediate dyspnea, cough, fever, nausea and vomiting, diarrhea, stomatitis, salivation and metallic taste. Symptoms may resolve or may progress to necrotizing, bronchiolitis, pneumonitis, pulmonary edema and pneumothorax. This syndrome is often fatal in children.

pneumonitis, pulmonary edema and pneumothorax. This syndrome is often fatal in children. Acidosis and renal damage with renal failure may occur. Inhaling volatile organic mercurials in high concentrations causes metallic taste, dizziness, clumsiness, slurred speech, diarrhea, and sometimes, fatal convulsions.

CHRONIC HEALTH EFFECTS: Inhalation of mercury vapors, absorption through intact skin, dusts, over a long period, causes mercurialism. Findings extremely variable and include tremors, salivation, stomatitis, loosening of teeth, blue lines on the gums, pain and numbness in extremities, nephritis, diarrhea, anxiety, headache, weight loss, anorexia, mental depression, insomnia, irritability, and instability, hallucinations and evidence of mental deterioration. (Mercury). May cause argyria (grayish-blue pigmentation of the skin (Alloy).

FIRST AID: Inhalation: Remove to fresh air. Restore and/or support breathing as needed. Administer O² for clinical pneumonitis (Mercury) Gently blow nose and irrigate with clean water (Alloy). Eyes: Flush with running water for 15 minutes, including under the eyelids (Both). Seek Medical Attention. Skin: Remove contaminated clothing. Wash affected area with soap and water. (Both) Seek medical attention.

INGESTION: Gastric lavage with 5% solution of sodium formaldehyde sulfoxylate followed by 2% solution of sodium bicarbonate (NaHCO₃), and finally leave 250cc of the sodium formaldehyde sulfoxylate in the stomach (Mercury). Seek medical assistance for further treatment, observation and support (Both).

---

## SECTION VI - REACTIVITY DATA STABILITY:

STABLE HAZARDOUS DECOMPOSITION PRODUCTS: Thermal decompostion products include toxic mercury vapors and oxygen.

HAZARDOUS POLYMERIZATION: None known.

INCOMPATIBILITIES: Violent reaction-acetylinic compounds; ammonia; boron; diiodophosphide; ethylene oxide; metals (aluminum, potassium, lithium, sodium, rebuidium); methyl azide, methylsilane, oxygen; oxidants (bromine, peroxyformic acid, chlorine dioxide, nitric acid, tetracarbonsylnickel, nitromethane, silver perchlorate) (Mercury). Acetylene, aziridine, bromine azide, 3-bromopropyne, carboxylic acid, ethylene glycol, electrolytes, ethanol + nitric acid, athylene oxide, ethyl hydroperoxide, iodoform, nitric acid, ozonides, peroxomonosulfuric acid, peroxyformic acid (Alloy), Hydrogen Peroxide.

---

## SECTION VII - SPILL AND DISPOSAL PROCEDURES

SPILLS: Do not touch spilled material. Stop leak if you can do it without risk. For small spills, take up with sand or other absorbent material and place into containers for later disposal. A mersury spill kit may also be used for small spills in the workplace. For large spills, dike for ahead of spill for later disposal. Keep unnecessary people away. Isolate hazard area and deny entry. (Mercury). Provide exhaust ventilation where possible. Carefully sweep or vacuum into acceptable waste container. Avoid generating airborne dust. (Alloy).

DISPOSAL: Dispose of in accordance with local, state, and federal regulations. This product or individual components may be salvaged or reclaimed for reuse.

---

## SECTION VIII - SAFE HANDLING ANS USE INFORMATION

PROTECTIVE EQUIPMENT:
Respiratory Protection: Yes
Ventilation/Local Exhaust: Yes
Protective Gloves: Yes
Eye Protection: Yes
Protective Clothing or Equipment: Separate work and street clothing. Store work clothing in special lockers. Showers to be taken before chaning into street clothes. Provide preplacement and periodic medical exams for those regularly exposed to mercury with emphasis directed to CNS-central nervous system, skin, lungs, liver, kidneys, and G.I. tract.

---

## SECTION IX - SPECIAL PRECAUTIONS

The TLV would be exceeded if the contents of a small mercury clinical thermometer were dispersed in a closed 100'x 100'x 15' room. Store in a cool, dry environment. Avoid contact or generation of dust. As of the date of preparation of this document, the foregoing information is believed to be accurate and is provided in good faith to comply with applicable federal and state law(s). However, no warranty or representation with respect to such information is intended nor given.