165 Cal.App.4th 1526 (2008)
RICHARD A. YABSLEY, Plaintiff and Appellant,
v.
CINGULAR WIRELESS, LLC, Defendant and Respondent.
No. B198827.
Court of Appeals of California, Second District, Division Six.
August 18, 2008.
*1529 Pettersen & Bark, William D. Pettersen; Grokenberger & Smith and James H. Smith for Plaintiff and Appellant.
McKenna Long & Aldridge, Ross H. Hyslop, James A. Tabb and Amy H. Ljungdahl for Defendant and Respondent.

OPINION
PERREN, J.
Respondent Cingular Wireless, LLC (Cingular), advertises a cellular phone for sale at half the retail price if the purchaser also enrolls in a *1530 calling plan package. The California Code of Regulations requires that the sales tax must be computed against the nonsale price of the product. The regulation permits, but does not require, that the charge be passed on to the customer. Cingular does so without informing the customer prior to sale that the tax will be based on the full price of the cell phone. The amount of tax is shown on the sales invoice furnished to the customer at the time of sale.
Appellant Richard Yabsley alleges that Cingular engaged in unfair competition in violation of Business and Professions Code section 17200[1] and misleading advertising in violation of section 17500 by failing to inform the consumer that the tax would be imposed on the full price of the cell phone. The trial court sustained Cingular's demurrer to Yabsley's first amended complaint without leave to amend finding that the provisions of California Code of Regulations, title 18, section 1585 (Regulation 1585)[2] requiring the payment of such a tax provided a "safe harbor" from a claim under section 17200. We affirm.

FACTUAL AND PROCEDURAL HISTORY
Cingular advertised a cell phone for $149.99, a 50 percent reduction in the phone's retail price, if the purchaser enrolled in a Cingular wireless calling plan. Yabsley saw the advertisement and purchased the cell phone with the calling plan. When he received the sales receipt, he noticed that the sales tax was imposed on the regular price of the cell phone, $299.99, rather than the discounted price of $149.99, resulting in the payment of $11.62 more in sales tax than he had anticipated.
Yabsley filed a putative class action complaint for declaratory relief against the State Board of Equalization (Board), asserting that Regulation 1585, governing taxation of sales of wireless communication devices, was invalid because it conflicted with Revenue and Taxation Code section 6051 imposing a sales tax on gross receipts.
*1531 Yabsley filed a first amended complaint (FAC), naming the Board and Cingular as defendants, but dismissed the Board the same day. The FAC alleges that Cingular's advertising practices were deceptive under sections 17200 and 17500 by failing to apprise prospective customers that sales tax would be charged on the undiscounted price of the cell phone.
Cingular filed a demurrer asserting it has immunity from such a claim under the safe harbor provided by Regulation 1585. This regulation requires that sales tax on a "bundled" cell phone sale, i.e., a cell phone purchased with a call plan, be calculated based on the phone's higher, unbundled price.
Prior to a hearing on Cingular's demurrer, Yabsley sought to file a second amended complaint (SAC). The trial court denied his motion and, after hearing on the FAC, the court sustained Cingular's demurrer without leave to amend.
In this appeal, Yabsley asserts he should have been permitted to file his proposed SAC. According to Yabsley, "the Second Amended Complaint contained additional and clarifying allegations." These proposed changes included deleting the Board as a party and seeking only declaratory relief against Cingular based on violations of sections 17200 and 17500 and Civil Code section 1750 et seq., the Consumers Legal Remedies Act. The SAC, like the FAC, alleges that Cingular violated these statutes by advertising the phone at the discounted $149.99 sales price, without also advertising that sales tax would be assessed on the undiscounted price of $299.99.

DISCUSSION

Standard of Review
When reviewing an order sustaining a demurrer, we review the trial court's ruling de novo, exercising our independent judgment to determine whether the complaint states a cause of action under any legal theory. We accept as true the properly pleaded allegations of facts in the complaint, but not the contentions, deductions or conclusions of fact or law. (Ochs v. PacifiCare of California (2004) 115 Cal.App.4th 782, 788 [9 Cal.Rptr.3d 734].)

The Unfair Competition Law
(1) The unfair competition law (UCL) prohibits "any unlawful, unfair or fraudulent business act or practice." (§ 17200.) The remedies for violation of the UCL are equitable in nature, i.e., injunction and restitution. (§ 17203.)
*1532 The scope of the UCL is broad and does not just proscribe specific business acts or practices. (Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527].) "By proscribing `any unlawful' business practice, `section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable. [Citation.] [¶] However, the law does more than just borrow. The statutory language referring to `any unlawful, unfair or fraudulent' practice . . . makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law." (Ibid.)
The scope of the UCL, however, is not unlimited. (Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th 163, 182.) "Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare [business] conduct unfair. If the Legislature has permitted certain conduct . . . courts may not override that determination. When specific legislation provides a `safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (Ibid.) "[W]here the allegedly unfair business practice has been authorized by the Legislature, no factual or equitable inquiry need be made, as the court can decide the matter entirely on the law." (Schnall v. Hertz Corp. (2000) 78 Cal.App.4th 1144, 1160 [93 Cal.Rptr.2d 439].)

The False Advertising Law
(2) California's false advertising law makes it "unlawful for any person,. . . corporation . . . , or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate ... before the public in this state, . . . in any newspaper or other publication, . . . or in any other manner or means whatever, . . . any statement, concerning that real or personal property or those services ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." (§ 17500; see Kasky v. Nike, Inc. (2002) 27 Cal.4th 939, 950 [119 Cal.Rptr.2d 296, 45 P.3d 243].) In sum, section 17500 "prohibits advertising property or services with untrue or misleading statements or with the intent not to sell at the advertised price." (Quelimane Co. v. Stewart Title Guaranty Co. (1998) 19 Cal.4th 26, 52 [77 Cal.Rptr.2d 709, 960 P.2d 513].)
"[A] statement is false or misleading if members of the public are likely to be deceived. . . . `The statute affords protection against the probability or likelihood as well as the actuality of deception or confusion.'" (Chern v. Bank *1533 of America (1976) 15 Cal.3d 866, 876 [127 Cal.Rptr. 110, 544 P.2d 1310].) To establish a violation of the false advertising law based on a claim of untrue and misleading advertising, "it is necessary only to show that `members of the public are likely to be deceived.'" (Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660].)

Regulation 1585 Has the Force and Effect of a Statute and Provides a "Safe Harbor"
Although section 17200 broadly prescribes "any unlawful, unfair or fraudulent business act or practice," it does not apply when specific legislation provides a "safe harbor" for the conduct at issue. (Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th 163, 180.) When specific legislation provides a "safe harbor," a plaintiff may not use the general UCL to assault that harbor. (20 Cal.4th at p. 182.) If the Legislature has permitted certain conduct or considered a situation and concluded that no action should lie, courts may not override that determination. (Ibid.)
Cingular asserts, and the trial court agreed, that Regulation 1585 provides a safe harbor for the conduct Yabsley asserts violates the UCL. Regulation 1585, subdivision (a)(3) states: "Bundled Transaction. The retail sale of a wireless telecommunication device which contractually requires the retailer's customer to activate or contract with a wireless telecommunications service provider for utility service for a period greater than one month as a condition of that sale. A transaction is a bundled transaction within the meaning of this regulation without regard to the method in which the price is stated to the customer. Also, it is immaterial whether the wireless telecommunication device and utility service are sold for a single price or are separately itemized in the context of a sale or on a sales invoice. A transaction is a bundled transaction if goods and services are sold as a single package, whether wireless telecommunication service is supplied to the customer by the retailer or by an independent service supplier. In such transactions, wireless devices may be sold at a `discounted' price, as an inducement for the customer to enter into an extended service contract. The fact that a wireless telecommunication device, such as a PCS (Personal Communication Service) telephone, may, because of its technological specifications, be subject to activation with only one service supplier, does not alone mean that the sale of the device will be treated as a bundled transaction."
(3) Relying on Krumme v. Mercury Ins. Co. (2004) 123 Cal.App.4th 924 [20 Cal.Rptr.3d 485], Yabsley contends that statutes can provide a safe harbor, but administrative regulations cannot. In Krumme, the appellate court *1534 rejected an insurance company's argument that regulations adopted by the Insurance Commissioner provided a safe harbor. Citing Cel-Tech as authority, the Krumme court said in a footnote: "These materials are not germane to our analysis because our Supreme Court has held that only statutes can create a safe harbor." (Id. at p. 940, fn. 5.) Cel-Tech, however, dealt with statutes enacted by the Legislature, and the safe harbor they created. There was no reference to regulations. Like the trial court here, we conclude that there is nothing in the Cel-Tech decision purporting to limit the safe harbor doctrine to statutes enacted by the Legislature.[3]
(4) The Legislature has delegated to the Board the job of promulgating regulations relating to the administration and enforcement of the tax statutes. (Rev. & Tax. Code, § 7051; Gov. Code, §§ 11342.1, 11342.2.) (5) The Administrative Procedure Act (APA) subjects proposed agency regulations to certain procedural requirements as a condition to their becoming effective. (Gov. Code, § 11340 et seq.) Pursuant to the APA, "No state agency shall issue, utilize, enforce, or attempt to enforce any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, which is a regulation as defined in Section 11342.600, unless the guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule has been adopted as a regulation and filed with the Secretary of State . . . ." (Gov. Code, § 11340.5, subd. (a).) If a rule constitutes a regulation within the meaning of the APA (other than an emergency regulation, which may not remain in effect more than 120 days), it may not be adopted, amended or repealed except in conformity with "basic minimum procedural requirements." (Gov. Code, § 11346, subd. (a).)
The APA requires that the agency give the public notice of its proposed regulatory action (Gov. Code, §§ 11346.4, 11346.5), issue a complete text of the proposed regulation with a statement of the reasons for it (id., § 11346.2, subds. (a), (b)), give interested parties an opportunity to comment on the proposed regulation (id., § 11346.8), respond in writing to public comments (id., §§ 11346.8, subd. (a), 11346.9), and forward a file of all materials on which the agency relied in the regulatory process to the Office of Administrative Law (id., § 11347.3, subd. (c)), which reviews the regulation for consistency with the law, clarity, and necessity (id., §§ 11349.1, 11349.3). "These requirements promote the APA's goals of bureaucratic responsiveness and public engagement in agency rulemaking." (Morning Star Co. v. State Bd. of *1535 Equalization (2006) 38 Cal.4th 324, 333 [42 Cal.Rptr.3d 47, 132 P.3d 249].) Any regulation or order of repeal that substantially fails to comply with these requirements may be judicially declared invalid. (Gov. Code, § 11350; California Advocates for Nursing Home Reform v. Bonta (2003) 106 Cal.App.4th 498, 507 [130 Cal.Rptr.2d 823].)
(6) The status of regulations promulgated by the Board was described by our Supreme Court in Yamaha Corp. of America v. State Bd. of Equalization (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031]: "[R]egulations adopted by an agency to which the Legislature has confided the power to `make law,' and which, if authorized by the enabling legislation, bind this and other courts as firmly as statutes themselves . . . ." The rule that valid administrative regulations have the force and effect of law has been reiterated in dozens of California cases. (See, e.g., Agricultural Labor Relations Bd. v. Superior Court (1976) 16 Cal.3d 392, 401 [128 Cal.Rptr. 183, 546 P.2d 687]; California Teachers Assn. v. California Com. on Teacher Credentialing (2003) 111 Cal.App.4th 1001, 1008 [4 Cal.Rptr.3d 369].) Many cases also have upheld safe harbors created by administrative regulations. (See, e.g., Dowhal v. SmithKline Beecham Consumer Healthcare (2004) 32 Cal.4th 910, 918 [12 Cal.Rptr.3d 262, 88 P.3d 1] [regulation adopted under Proposition 65 providing safe harbor for consumer product warning labels]; Environmental Law Foundation v. Wykle Research, Inc. (2005) 134 Cal.App.4th 60, 62 [35 Cal.Rptr.3d 788] [same]; In re Vaccine Cases (2005) 134 Cal.App.4th 438, 448 [36 Cal.Rptr.3d 80] [same]; People ex rel. Lungren v. Cotter & Co. (1997) 53 Cal.App.4th 1373, 1377-1378 [62 Cal.Rptr.2d 368] [same]; Ingredient Communication Council, Inc. v. Lungren (1992) 2 Cal.App.4th 1480, 1485-1486 [4 Cal.Rptr.2d 216] [same]; Pulaski v. Occupational Safety & Health Stds. Bd. (1999) 75 Cal.App.4th 1315, 1332-1333 [90 Cal.Rptr.2d 54] [upholding validity of safe harbor regulation regarding standards for employers to reduce repetitive motion injuries]; see also Marshall v. Bankers Life & Casualty Co. (1992) 2 Cal.4th 1045, 1054-1055 [10 Cal.Rptr.2d 72, 832 P.2d 573] [discussing safe harbor provided by ERISA regulation].)
(7) "`Because agencies granted such substantive rulemaking power are truly "making law," their quasi-legislative rules have the dignity of statutes.'" (Bolsa Chica Land Trust v. Superior Court (1999) 71 Cal.App.4th 493, 503 [83 Cal.Rptr.2d 850].) Regulation 1585 has the "force and effect" and the "dignity" of a statute. Therefore, it may, and does, provide a safe harbor to Cingular.
Yabsley argues that even if Regulation 1585 provides a safe harbor, it does not immunize Cingular's conduct in failing to disclose to purchasers that sales tax would be charged on the retail price of the phone. Regulation 1585 is silent as to the retailer's duty to disclose the amount of sales tax charged *1536 on a sale and Yabsley cites no statute or other law requiring an advertisement for wireless communications device, or any other consumer product, to contain information on the sales tax to be applied to the sale.
(8) The duty of a retailer to disclose the sales tax imposed on the sale of tangible personal property is governed by Civil Code section 1656.1.[4] That section creates a rebuttable presumption that a purchaser agrees to pay the sales tax shown on the sales receipt.
(9) The sales invoice Cingular gave to Yabsley stated the amount of the sales tax imposed on the sale. It not only gave Yabsley notice of the amount of sales tax that would be imposed, it constituted a contract of sale between Cingular and Yabsley. As with any other contract, Yabsley had the right to refuse to enter into the contract for the price stated. Because Cingular complied with all applicable regulations, Yabsley's claims under sections 17200 and 17500 fail. (See Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th 163, 182 ["If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination."]; see also South Bay Chevrolet v. General Motors Acceptance Corp. (1999) 72 Cal.App.4th 861 [85 Cal.Rptr.2d 301] [car dealership's contention that auto financing company's business practice of calculating interest under the 365/360 method was unlawful as contrary §§ 17200 and 17500 was without merit because California has no law or regulation requiring a lender to use a 365-day year in computing interest or quoting annual interest rates on commercial loans].)
The trial court did not err in sustaining the demurrer without leave to amend. The question before us is one of statutory interpretation, a pure *1537 question of law. (Carmona v. Division of Industrial Safety (1975) 13 Cal.3d 303, 310 [118 Cal.Rptr. 473, 530 P.2d 161].) The FAC and the parties' briefs on demurrer set forth the relevant statutes and regulations and contain the parties' arguments concerning the interpretation of those statutes and regulations. Thus, no purpose would be served by permitting a further amendment.
The judgment of dismissal is affirmed. Respondent shall recover costs.
Yegan, Acting P. J., and Coffee, J., concurred.
NOTES
[1] All statutory references are to the Business and Professions Code unless otherwise stated.
[2] Regulation 1585, subdivision (b) provides: "Application of Tax. [¶] (1) In General. Tax applies to the gross receipts from the retail sale of a wireless telecommunication device. The retailer of the wireless telecommunication device is required to report and pay the tax. [¶] . . . [¶] (3) Bundled Transactions. Tax applies to the gross receipts from the retail sale of a wireless telecommunication device sold in a bundled transaction, measured by the unbundled sales price of that device. Tax applies to the unbundled sales price whether the wireless telecommunication device and utility service are sold for a single price or are separately itemized in the context of a sale or on a sales invoice. The retailer of the wireless telecommunication device is required to report and pay tax measured by the unbundled sales price of the device and may collect tax or tax reimbursement from its customer measured by the unbundled sales price. Tax does not apply to the charges in excess of the unbundled sales price made for telecommunication services."
[3] The discussions in Krumme pertaining to the role of regulations in an action under section 17200 are dicta and unnecessary to its conclusion. In any event, our reading of Cel-Tech suggests precisely the opposite conclusion. First, a regulation specifically makes lawful the very conduct that Yabsley contends constitutes an unfair competition and, second, Cel-Tech refers to regulations of a federal regulatory agency (Federal Trade Commission) as an example of a safe harbor. (Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th 163, 185-186.)
[4] Civil Code section 1656.1 states:

"(a) Whether a retailer may add sales tax reimbursement to the sales price of the tangible personal property sold at retail to a purchaser depends solely upon the terms of the agreement of sale. It shall be presumed that the parties agreed to the addition of sales tax reimbursement to the sales price of tangible personal property sold at retail to a purchaser if:
"(1) The agreement of sale expressly provides for such addition of sales tax reimbursement;
"(2) Sales tax reimbursement is shown on the sales check or other proof of sale; or
"(3) The retailer posts in his or her premises in a location visible to purchasers, or includes on a price tag or in an advertisement or other printed material directed to purchasers, a notice to the effect that reimbursement for sales tax will be added to the sales price of all items or certain items, whichever is applicable. [¶] . . . [¶]
"[(c)](2) Reimbursement on sales prices in excess of those shown in the schedules may be computed by applying the applicable tax rate to the sales price, rounded off to the nearest cent by eliminating any fraction less than one-half cent and increasing any fraction of one-half cent or over to the next higher cent.
"(3) If sales tax reimbursement is added to the sales price of tangible personal property sold at retail, the retailer shall use a schedule provided by the board, or a schedule approved by the board.
"(d) The presumptions created by this section are rebuttable presumptions."